IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JOSEPH F. BATES, JR., )
)
    PLAINTIFF, )
)
VS. ) CV 98-H-2512-NE
)
BALLEW & ROBERTS CONSTRUCTION )
CO., )
)
    DEFENDANT. )

**FILED**
99 DEC -6 PM 2: 49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**
DEC - 6 1999

## MEMORANDUM OF DECISION

The Court has before it the August 25, 1999 motion for summary judgment of defendant Ballew & Roberts Construction Company ("Ballew & Roberts"). Pursuant to the Court's August 27, 1999 order, the motion was deemed submitted, without oral argument, on September 24, 1999.

### I. Procedural History

Plaintiff Joseph F. Bates, Jr. commenced this action on October 2, 1998 by filing a complaint in this Court, alleging that he was wrongfully terminated from his employment with defendant Ballew & Roberts. Plaintiff asserts claims for discriminatory discharge and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Defendant's August 25, 1999 motion for summary judgment asserts that no genuine issue of fact exists and that defendant is entitled to summary judgment as to all of plaintiff's claims.

On September 10, 1999, defendant filed a brief in support of its motion.  On September 24, 1999, plaintiff filed a brief in opposition to defendant's motion, and on October 6, 1999, defendant filed a brief in reply.  Both parties have submitted evidence in support of their respective positions with regard to the pending motion.[1]

### II. Standards for Evaluating a Summary Judgment Motion

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial

---

[1] Defendant has submitted the affidavits of Thomas Pigg, W.T. Bain, Larry Horton, Myron Smith, Grover Hankins, David Abramson, Mickey Montgomery, and Dr. Howard M. Strickler; deposition excerpts of plaintiff Bates; and plaintiff's responses to defendant's interrogatories.  Plaintiff's evidentiary submissions consist of the affidavit of plaintiff Bates and the affidavit of Bennie Ingram.

responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2

3

F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. <u>Fitzpatrick</u>, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving

party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343 (1996).

### III. Facts

Ballew & Roberts is a paving company located in Sheffield, Alabama. (Pigg Aff. ¶ 1.) Plaintiff, an African-American, was initially hired by Ballew & Roberts in May of 1994. (Id. at ¶ 2.) After working for approximately three months in the company's asphalt plant, plaintiff voluntarily terminated his employment. (Id.) Some two years later, in or about March 1996,

plaintiff again applied and was accepted for a job with Ballew & Roberts. (Id. at ¶ 3.) Plaintiff began working as a grading crew laborer, but was later transferred to the paving crew. (Id.)

When plaintiff was rehired in 1996, Ballew & Roberts had an anti-drug policy which required new employees to take a drug test, i.e. the "pre-employment test." (Id. at ¶ 4; Strickler Aff. ¶ 2.) The policy also provided for random drug testing, and for individual employee testing upon demand of Ballew & Roberts if the company had reason to believe that an employee had been under the influence of drugs while on the job. (Pigg Aff. ¶ 4.) The drug testing for Ballew & Roberts was done by Employers Drug Program Management ("Employers DPM"), an independent company which provides drug testing services for various businesses. (Id. at ¶ 5.) The agreement between Ballew & Roberts and Employers DPM required Ballew & Roberts to provide them with a list of employees; Employers DPM then randomly selected from this list the employees who would be tested. Ballew & Roberts had no say in which employees were selected for testing. (Id.)

Plaintiff Bates took his pre-employment test in April 1996. (Strickler Aff. ¶ 3.) The test showed plaintiff to be positive for Codeine and Morphine. (Id. at ¶ 4.) Bates was permitted to

continue working pending subsequent test results.[2] (Pigg Aff. ¶ 6.) Later in April 1996, plaintiff was given a "Return to Duty" test, for which he tested negatively. (Pigg Aff. ¶ 6; Strickler Aff. ¶ 6.) Plaintiff also passed a "Follow-Up" test which was given to him in May 1996. (Id.) At this point, plaintiff was returned to regular status within the Employers DPM system. (See Pigg Aff. ¶ 6.) Plaintiff was not drug tested again during the remainder of his employment with Ballew & Roberts. (Pigg Aff. ¶ 6; Strickler Aff. ¶ 7.)

On August 13, 1997, the Ballew & Roberts paving crew was preparing to begin work on the Lowe's parking lot in Florence, Alabama. (Bates Aff. ¶ 3.) Because of heavy rains, however, the crew was forced to remain in their vehicles until approximately 1:00 p.m., when W.T. Bain, the construction superintendent, determined that the weather was suitable for work to begin. (See Bates Aff. ¶ 3, 4; Bain Aff. ¶ 2.) Immediately after Bain

---

[2]Under the program administered by Employers DPM, when an employee tests positively on any drug screen, he is placed in the Return to Duty/Follow-Up testing program, assuming that the employer does not immediately terminate the employee. If the employee passes the "Return to Duty" test, he is given a "Follow-Up" test a few days later. If the employee passes the Follow-Up test, he is returned to regular status with Employers DPM and is not subject to further testing. The employee remains at all times, however, subject to random or reasonable suspicion testing. (See Pigg Aff. ¶ 5.)

ordered the crew to work, an altercation ensued between Bain and plaintiff. (See Bates Aff. ¶ 7.) The facts surrounding the altercation are contested by the parties. Plaintiff states that Bain singled him out and called him a "nigger" and a "son of a bitch." (Bates Aff. ¶ 7.) Plaintiff admits calling Bain a "son of a bitch" also, but asserts that he was merely responding to the verbal attack which was initiated by Bain. (See id.) Plaintiff denies that he ever threatened Bain with physical assault, or that anyone had to restrain him from physically assaulting Bain. (Id. at ¶ 7.)

Defendant contends that plaintiff, not Bain, initiated the confrontation, and that plaintiff called Bain a "son of a bitch" and threatened to "slap him down." (Bain Aff. ¶ 2.) Defendant claims that Bain did not call plaintiff any derogatory names or make any reference to plaintiff's race. (Id.) Defendant concedes only that, in response to plaintiff's calling Bain a "son of a bitch," Bain replied "well you're one too." (Id.)

After the confrontation, Bain telephoned Thomas Pigg, the Vice President of Ballew & Roberts, and informed him about the incident. (Bain Aff. ¶ 2; Pigg Aff. ¶ 8.) Pigg arrived at the job site shortly thereafter and discussed the incident with plaintiff. (Pigg Aff. ¶ 9.) Pigg then decided to take plaintiff

8

home for the remainder of the day until he could gather additional information about the altercation between plaintiff and Bain. (Id.) During the ride to plaintiff's home, plaintiff told Pigg that Bain had called him a "nigger" and that he believed Bain did not like "black folks." (Id.) He also told Pigg that he believed Bain had been "leaning on him for the past year." (Id.) Pigg told plaintiff that this was the first he had heard of any problem between plaintiff and Bain. (Id.)

On the afternoon of the incident and the following morning, Pigg and David Abramson, Ballew & Roberts' President, conducted an investigation into the incident. (Pigg Aff. ¶ 9; Abramson Aff. ¶ 3.) After interviewing several employees who witnessed the dispute between plaintiff and Bain, Pigg and Abramson determined that plaintiff had behaved inappropriately and agreed that his employment should be terminated. (Pigg Aff. ¶ 6; Abramson Aff. ¶ 4.) On August 14, 1999, Pigg informed plaintiff that he was discharged from Ballew & Roberts. (Pigg Aff. ¶ 10.)

### III.  ARGUMENT

Plaintiff's complaint alleges 1) that he was discharged from his employment on the basis of race; 2) that he was subjected to a hostile working environment; and 3) that he was subjected to different terms and conditions of employment than white

9

employees.³  Each of plaintiff's claims are analyzed separately below.

A.  **Discriminatory Discharge**

A plaintiff may establish a prima face case of discrimination by offering direct evidence, circumstantial evidence, or statistical evidence. See Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Direct evidence is "evidence which, if believed, would prove the existence of a fact without inference or presumption." Carter, 870 F.2d at 581-82. When confronted with direct evidence of discrimination, "an employer must prove that the same employment decision would have been made absent any discriminatory intent." Id. at 582.

Plaintiff in the instant case alleges that Bain called him a "nigger" during the confrontation that prompted plaintiff's termination, and that this constitutes direct evidence of discrimination. While plaintiff is correct that racially derogatory statements in the workplace can constitute direct evidence of discrimination, plaintiff overlooks the requirement

---

³Although plaintiff's complaint sets forth a separate count for his disparate terms and conditions claim, this claim is actually encompassed in his discriminatory discharge claim, and therefore, is addressed in the discriminatory discharge portion of the analysis.

10

that the statement be made by a decisionmaker or one who participated in making the challenged employment decision. See Trotter v. Board of Trustees of the Univ. of Alabama, 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."). Bain, who plaintiff alleges called him the racially derogatory name, was not involved in the decision to terminate plaintiff's employment.  (Pigg Aff. ¶ 9; Bain Aff. ¶ 2.)  Rather, Pigg and Abramson made the decision to discharge plaintiff after conducting their own independent investigation into the matter. (See Pigg Aff. ¶ 9; Abramson Aff. ¶¶ 3, 4.)  Because Bain was not involved in the employment decision at issue, plaintiff cannot rely on direct evidence to show that race motivated defendant's decision to terminate his employment.  Plaintiff may, however, attempt to establish his claim on the basis of circumstantial evidence.

The McDonnell Douglas framework is used to analyze circumstantial evidence.  Under McDonnell Douglas, a plaintiff may establish a prima facie case of discriminatory discharge by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that his employer

11

treated similarly situated employees of other races more favorably; and (4) that he was qualified to do the job. <u>Jones v. Bessemer Carraway Medical Center</u>, 137 F.3d 1306, 1310 (11th Cir. 1998); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). Once plaintiff has established a prima facie case, an inference of discrimination arises that defendant can rebut by articulating a legitimate, nondiscriminatory reason for the employment action at issue. See <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973). If defendant articulates such a reason, then plaintiff may attempt to show that the proffered reason was merely a pretext for defendant's acts. See <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

 The parties in the instant case do not dispute that plaintiff is a member of a protected class, that he suffered an adverse employment action, or that he was qualified to do his job. Thus, only the third element of the prima facie case is in question. With regard to the third element, plaintiff must produce evidence that similarly situated, nonminority employees were treated more favorably than him. See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Plaintiff must show that he and the employees identified are "similarly situated in all relevant aspects." See <u>Holifield</u>, 115 F.2d at 1562. Whether

employees are similarly situated depends on "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield, 115 F.3d at 1562; Jones v. Gerwens, 874 F.2d 1534, 1539-40 (11th Cir. 1989) (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir. 1985) (the most relevant inquiries in the 'disciplinary context' are 'the nature of the offenses committed and the nature of the punishments imposed.')). Thus, plaintiff must show in essence that nonminority employees who were accused of similar offenses were punished less harshly than him. In the present case, plaintiff has failed make such a showing.

Plaintiff contends that he was terminated for conduct for which white employees would not have been terminated. Specifically, plaintiff claims that defendant "is ten times more strict in disciplining black employees than white employees." (See Plaintiff's Response to Interrogatory No. 5(a).) Plaintiff sets forth the following allegations in support of this assertion: 1) that two white laborers, Daniel Quillan and Doug Quillan, and a truck driver, Johnny Peters, each had verbal altercations with Bain but were not terminated; 2) that the Quillans' would use marijuana on the job but were not disciplined or required to take drug tests; 3) that Daniel Quillans sexually

13

harassed a female but was not disciplined; 4) that John Waldrep and Thomas Waldrep stole from the company and drank alcoholic beverages on the job but were not disciplined or drug tested; 5) that the Quillans' frequently drove company vehicles without licenses but were never disciplined; and 6) that Doug Quillans refused to "flag vehicles" as he was supposed to do and that he would sit down and read while on the job, but was never disciplined.  (See Plaintiff's Brief, p. 3-4; Plaintiff's Response to Interrogatory No. 5.)

    None of plaintiff's allegations, even if accepted as true, are sufficient evidence of similarly situated employees for the purposes of establishing a prima facie case.  Plaintiff was terminated from his employment for insubordination, not drug or alcohol use, poor work ethic, or the violation of any other company policy.  Thus, the only persons identified who may qualify as similarly situated are Daniel Quillan, Doug Quillan, and Johnny Peters, whom plaintiff asserts have had altercations with their supervisors.  Plaintiff states in his affidavit that "[w]hite laborers, Daniel Quillen and Doug Quillan, and truck driver, Johnny Peters, have had verbal altercations with W.T. Bain yet were not fired."  With the exception of this statement, however, plaintiff provides no evidence that the alleged

14

altercations between each of these men and Bain were similar to his altercation with Bain. The evidence suggests that the dispute between plaintiff and Bain was very heated,[4] and plaintiff himself admits that he cursed Bain in front his coworkers. Plaintiff has simply not shown that another employee, black or white, has engaged in a dispute with a supervisor of the same or a similar magnitude. Because plaintiff has not identified a similarly situated employee, his discriminatory discharge claim must fail.

Even if plaintiff had established a prima facie case, however, his claim would nonetheless fail because defendant has produced a legitimate reason for terminating plaintiff's employment, and plaintiff has not produced evidence that defendant's proffered reason--insubordination--was merely a pretext for discrimination. Pigg stated that he was unaware of a situation where a Ballew & Roberts employee had confronted a supervisory employee in front of coworkers the way that plaintiff

---

[4]Larry Horton, an employee who witnessed the incident, stated that plaintiff "appeared as if he wanted to fight with him [Bain]," and Grover Hankins, another employee who witnessed the incident, stated that he and another employee had to physically restrain plaintiff from physically assaulting Bain. (See Horton Aff. ¶ 3; Hankin Aff. ¶ 3.) Hankins also testified that he heard plaintiff tell Bain: "[I'll] get your ass." (Hankin Aff. ¶ 3.)

15

had confronted Bain. (See Pigg Aff. ¶¶ 9, 12.) Further, both Pigg and Abramson learned through their investigation of the incident that plaintiff had on previous occasions exhibited a volatile temper on the job. (See Pigg Aff. ¶ 9; Abramson Aff. ¶ 3.) Based on these facts, Pigg and Abramson determined that plaintiff's employment should be terminated. The Court will not question defendant's judgment. See Jones, 137 F.3d at 1311, n.16 ("[F]ederal courts do not sit to review the accuracy of the employer's fact findings or of the employer's decision to terminate a plaintiff's employment."). See also Nix v. WLCY Radio/Rahall Communication, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it is not a discriminatory reason."). In sum, defendant is entitled to summary judgment as to plaintiff's discriminatory discharge claim, for even if plaintiff had established a prima facie case, defendant has satisfied his burden of stating a legitimate, nondiscriminatory reason for the employment action at issue.

**B.     Hostile Working Environment**

In addition to his discriminatory discharge claim, plaintiff contends that he was subjected to a hostile working environment.

16

Plaintiff sets forth numerous allegations in support of his hostile environment claim. First, plaintiff maintains that in 1996, he and Bain were working in a black neighborhood when Bain allegedly stated: "I'm going to hurry up and get the hell out of here because there is going to be a lot of shooting and fucking going on." (Plaintiff's Responses to Interrogatory No. 4(a).) Plaintiff claims that Bain then asked whether plaintiff had a problem with that statement. (Id.) Next, plaintiff asserts that on separate occasions Bain called him a "stupid son of a bitch" and stated that he wished a dump truck would fall on him. (Id.) Plaintiff also states that Bain continually used racially derogatory terms and told race-related jokes. Plaintiff contends further that Bain made him take four drug tests but would not require white employees to be tested. (Id.) Plaintiff claims that Bain made a bet for $100.00 with Jack Montgomery, the labor foreman, that plaintiff would not pass his drug tests. (Id.) Plaintiff also asserts that Bain made him work while his feet were hurting but would not force other employees to work who were injured. (Id.) Additionally, plaintiff contends that in 1997, Bain told Mickey Montgomery, another employee, that the only reason he could not terminate plaintiff was because plaintiff owed the company money. (Id.) Finally, plaintiff claims that

17

Bain has disproportionately fired black employees and that he is more lenient when disciplining white employees. (Id.)

To establish a prima facie case on a hostile working environment claim, plaintiff must show that 1) he is a member of a protected class; 2) he was subject to unwelcome harassment; 3) the harassment complained of was based upon race; and 4) the harassment complained of affected a term, condition, or privilege of employment. See Henson v. City of Dundee, 682 F.2d 897, 903-04 (11th Cir. 1982). With regard to the fourth element, plaintiff must establish that the alleged harassment was "sufficiently pervasive so as to alter the terms and conditions of employment and create an abusive working environment." Henson, 682 F.2d at 904. While the parties do not dispute that plaintiff is a member of a protected class, the remaining elements are contested. Defendant argues that plaintiff's hostile environment claim is based on "nothing more than conclusory, generalized allegations and hearsay." (See Defendant's Brief, p. 18.) For the reasons discussed below, this Court agrees.

Several of the alleged incidents concern statements about which plaintiff has no personal knowledge. Plaintiff concedes that other employees informed him of the alleged statements about

18

the dump truck falling on him; the bet that he would fail his drug test; and the statement that Bain would have fired him if he had not owed the company money. Apart from obvious hearsay problems, plaintiff has not provided the Court with evidence that the statements were made at all. Defendant, however, has produced the affidavits of several African-American employees stating that they never heard Bain use any racially derogatory language. (See Horton Aff. ¶ 2; Smith Aff. ¶ 2; Hankins Aff. ¶ 4.) Two of these employees have been employed with defendant for at least fourteen years. (See Horton Aff. ¶ 1; Hankins Aff. ¶ 1.) Defendant has also produced evidence that plaintiff was not required to take any drug tests other than those associated with his pre-employment test, and that these tests were conducted fully consistent with company policy. (See Strickler Aff. ¶ 7; Pigg Aff. ¶ 6.) Plaintiff has failed to produce evidence to the contrary. Likewise, plaintiff claims that defendant fired blacks in numbers disproportionately higher than whites, yet plaintiff has not identified a single employee of any race who has been fired since his employment began with Ballew & Roberts. Bates has also failed to identify an instance where an African-American employee was punished more harshly for the same conduct committed by a white employee.

19

Plaintiff's remaining complaint consists of Bain's alleged statement to plaintiff about "getting out of the black neighborhood before a shooting occurred." Even if Bain made the statement, this is not sufficient evidence to support plaintiff's hostile environment claim. See Henson, 682 F.2d at 903 (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir 1971) ("[T]he 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' does not affect the terms, conditions, or privileges of employment to a sufficiently significant degree to violate Title VII.")). In sum, plaintiff has failed to show that he was subjected to a hostile working environment. Accordingly, defendant is entitled to summary judgment as to this claim, along with plaintiff's claim for discriminatory discharge.

## IV. Conclusion

The Court finds that no genuine issue of fact exists and that defendant is entitled to summary judgment as to all of plaintiff's claims. A separate order will be entered.

Done this  6th  day of December, 1999.

SENIOR UNITED STATES DISTRICT JUDGE